Filed 3/17/22  P. v. Lopez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br>　　　Plaintiff and Respondent,<br>v.<br>DANIEL LOPEZ,<br>　　　Defendant and Appellant. | A154417<br><br>(Solano County<br>Super. Ct. No.<br>VCR228164) |

Daniel Lopez was convicted of two counts of attempted murder arising out of a bar room shooting.  His defense was identity:  his counsel maintained the eyewitness identification was unreliable, and his wife testified he was with her.

Defendant raises numerous issues on appeal, primarily regarding eyewitness identification issues, claimed prosecutorial misconduct, erroneous jury instructions, and insufficient evidence to support his conviction.  He also contends, and the People concede, that the one-year enhancements imposed for prior prison terms under Penal Code section 667.5[1] must be stricken.  We agree the enhancements should be stricken and the case remanded for resentencing.  In all other respects, we affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

1

# BACKGROUND

The shooting occurred in a bar about a half hour before closing.  Two bartenders, Heidi and Nicole, were working that night.  Heidi noticed a man "pacing back and forth" in front of the bar.  He aggressively said to Nicole "give me a shot."  After Nicole responded that they had already announced last call, the man banged his fist on the bar and said "give me a fucking shot."  He then pulled out a gun and pointed it first at Nicole and then at the bar's bouncer, who had approached him.  The man told the bouncer to "back the fuck up," and then said "let me get that drink now," and waved the gun.

The man then moved towards a group of patrons, waving the gun and "pointing it at everybody."  Jeffrey, one of the patrons, saw the man point the gun at a woman in the group.  The man then "stuck his hand around" Jeffrey's throat and pointed the gun at his face.  Jeffrey punched the shooter three times in the face and "caught eyes" with him.  The man "immediately started shooting off the gun."  One of the shots hit Jeffrey near the top of his jaw.

At that point, another patron, Doug, attempted to grab the man's gun.  After shooting Doug in the wrist, the man pointed the gun towards a nearby group of people, then "turned and took off" out the back door of the bar.

When the police arrived, Nicole described the shooter as "[a] Mexican wearing a black hoodie."  An officer then drove her to where police had detained an individual and asked if she could identify him as the shooter.  Nicole was "100 percent" sure it was not him, because "[i]t was not the right clothing.  He was taller [and] [h]e didn't have a giant tattoo on his neck."  She described the shooter as "short, Hispanic.  No more than 5' 5."  Heavy set."  "He had a little bit of facial hair and then the biggest part was the huge tattoo under his left ear to his throat."  His eyes were brown, but had huge,

2

dilated pupils. At trial, Nicole testified she looked at the shooter "straight on" and had eye contact with him "[t]he whole time."

Later that day, police showed an array of six photographs of men, including defendant in photograph one, to several people who had been at the bar. Heidi, the bartender, indicated numbers one and three looked familiar, but she could not be "a hundred percent sure." Jeffrey, the first patron who was shot, identified photographs one or three as possibly being the shooter. Another patron seated next to the shooter identified photographs one and four. Doug, who was shot in the wrist, was 75 to 80 percent sure the man depicted in photograph one was the shooter.

Following an anonymous tip identifying defendant and a car associated with him, defendant was arrested while a passenger in that car. In the vehicle, police found a bullet, gun holster, knife, cell phone, and mail belonging to defendant. The gun holster and knife were in the passenger door pocket, while the mail was in the glove box. There were also two bullet holes in the car, one on the exterior of the driver's side door, and one in plastic footrest on the driver's side of the car.

The district attorney charged defendant with two counts of attempted murder (§§ 664, 187, subd. (a)), six counts of assault with a firearm (§ 245, subd. (a)(2)), and possession of a firearm by a felon. (§ 29800, subd. (a)(1).) The information also alleged infliction of great bodily injury and personal use of a firearm enhancements as to both counts of attempted murder. The information further alleged defendant had a prior strike conviction (§§ 667, subds. (b)–(j), 1170.12) and that he had prior convictions within the meaning of section 667, subdivision (a) and 667.5, subdivision (b).

At trial, Nicole, Jeffrey, and Doug all positively identified defendant as the shooter. The bouncer, Kalin, who had not been shown the photo spread,

3

also positively identified defendant.  Heidi identified defendant, as well, although she could not be a "hundred percent" certain.  Two other witnesses, the patron seated next to the shooter and a barback working that night, were unable to identify the shooter.

Defendant's wife testified defendant was with her at the time of the shooting.  She testified they checked into a Motel 6 in Vallejo around noon on November 26th with her baby and checked out on the following morning around 9:00 or 10:00 a.m., having never left the motel room.  They got a room, rather than staying at her home, so they could have "intimate time together" and so defendant could bond with the baby.  The room was in defendant's name, but she paid for it.  They left in separate cars.

Surveillance videos from the bar depicting the shooting were played and admitted at trial.

The jury found defendant not guilty of one count of assault with a firearm, and two counts of assault with a firearm were dismissed.  It found him guilty of all remaining counts and found true the enhancing allegations.

The court sentenced defendant to a total prison term of 111 years to life.

## DISCUSSION

### The Six-Photo Lineup

Defendant claims the six-photo lineup was "highly suggestive," "rendered the trial fundamentally unfair," and violated his due process rights, and the trial court therefore erred in denying his in limine motion to exclude the pretrial identifications.  (Capitalization omitted.)

"A defendant's claim that an identification procedure was unduly suggestive is a 'mixed question of law and fact.'  [Citations.]  This standard of review applies because 'the facts are established, the law is undisputed, and

4

the issue' we must resolve 'is whether the law as applied to the established facts is violated.' [Citation.] We review the so-called 'historical facts,' those factual determinations that underpinned the trial court's conclusion that the identification procedure was or was not suggestive, 'under a deferential standard.' [Citation.] This standard acknowledges that the trial court may have made 'credibility determinations,' that 'contribute[d] to deciding the facts of what had already happened, [but] were not dispositive of the inquiry because the trial court did not have a "first-person vantage" ' to whatever 'facts occurred outside of court.' " (*People v. Wilson* (2021) 11 Cal.5th 259, 283 (*Wilson*).)

A due process violation occurs " ' "only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " ' [Citation.] If we determine the procedure was suggestive, no due process violation arises if ' " 'the identification itself was nevertheless reliable under the totality of the circumstances.' " ' [Citations.] In assessing the totality of the circumstances, we consider ' "such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." [Citations.] "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." ' " (*Wilson, supra,* 11 Cal.5th at p. 283.)

" ' "A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1164, italics omitted, superseded by statute on other grounds as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th

5

1096, 1106.) Thus, photo arrays in which a defendant's photo "stands out" in some way are impermissibly suggestive. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217 (*Johnson*), superseded by statute on other grounds as recognized in *Verdin v. Superior Court, supra,* 43 Cal.4th at p. 1106.) The danger of errors in witness identification based on photo arrays is increased "if [police] show . . . the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." (*Simmons v. United States* (1968) 390 U.S. 377, 383.)

"Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." (*People v. Yeoman* (2003) 31 Cal.4th 93, 125 (*Yeoman*).) " '[I]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa*).)

Defendant maintains the six-photo lineup caused his photo to "stand out" for three reasons: he was the only one wearing a hoodie, "the only person with extensive facial hair . . . including a moustache," and his photo was "in the number one position."

The photo array depicted six men who all appeared to be Hispanic, of about the same age, and with short dark hair and a moustache.

Defendant's claim that he is the "only person with extensive facial hair" is belied by the photos: every man in the photo array has a moustache.[2] While defendant's photo shows him with a moustache that appears to extend below his lip, the photo does not depict "extensive facial hair." And, "[m]inor

---

[2] The man depicted in photo five appears to have a faint moustache that is visible on one side, but the photo is overexposed.

differences in facial hair among the participants did not make the lineup suggestive." (*Johnson*, *supra*, 3 Cal.4th at p. 1217.)

Defendant's claim that he is the only one wearing a "hoodie" causing his photo to stand out is also not supported by the photo lineup. Defendant's photo depicts him wearing a shirt with what appears to be a hood that is not pulled over his head. His shirt was dark in color, as were the shirts of the men depicted in three of the other photos. Minor differences in clothing worn by the defendant do not make him impermissibly "stand out." (See *People v. Lawrence* (1971) 4 Cal.3d 273, 280 [photo array not impermissibly suggestive where the "defendant is the only participant wearing a gold shirt and gold sweater, whereas the four other men wore white shirts or white sweaters"].)

As for defendant's claim that his placement in the number one position caused him to stand out, "no matter where in the array a defendant's photograph is placed, he can argue that its position is suggestive." (*Johnson, supra,* 3 Cal.4th at p. 1217.)

As the trial court found in denying defendant's motion, "In looking at the photos I do not find any one in particular unduly suggestive or unreliable or the identification is unreliable such that these identifications should be excluded. I would note subjects in one, two, four and five actually there is [a] similarity between the photos and the facial features. Number three actually looks like a similar version of number two in many ways. I would note the defendant who is number one, he is the only one with the moustache that goes down the laugh lines. . . . [¶] . . . [¶] In any event, I would note he's the only one with that sort of moustache. I would point out that number two, number three, number four and six clearly all have facial hair, albeit not the same type of moustache. Number six may have some light moustache, but they all have some sort of facial hair, all perhaps number five. And the fact

7

that number one is wearing a hoodie, I don't think that is unduly suggestive such that the witness would be pointing towards number one."

Because we conclude the photo array was not impermissibly suggestive, we need not and do not determine the reliability of the resulting identification. (*Yeoman, supra,* 31 Cal.4th at p. 125.) Thus, " 'our inquiry into the due process claim ends.' " (*Ochoa, supra,* 19 Cal.4th at p. 412.)

### *Witness Identifications at Trial*

Defendant claims the asserted suggestive nature of the photo array combined with the "tainted in-court identification" denied him due process. He maintains the in-court identifications were "unreliable" because "all the witnesses identifying [defendant] spoke to at least one other witness [or] posted on social media," three witnesses were shown defendant's booking photo and asked "if they could identify the man in that photo in the courtroom," and four witnesses were shown the bar surveillance video before being asked to identify the shooter in court. Thus, defendant concludes "all of the witnesses were tainted by the suggestive lineup."

Defendant first claims certain witnesses' testimony at trial identifying defendant as the shooter was the product of "suggestive cues." He maintains these identifications were tainted because the "prosecutor showed witnesses [Nicole], [Heidi], and [Kalin] [defendant's] booking photo, Exhibit 89, and asked them if they could identify the man in that photo within the courtroom."

At the outset, we observe defendant failed to object to this questioning on the basis of "suggestive cues," thereby forfeiting the claim on appeal.[3] (Evid. Code, § 353; *People v. Flinner* (2020) 10 Cal.5th 686, 726 ["But it is still

---

[3] As we shall discuss, as to Kalin, the court overruled a nonspecific "foundation and improper question" objection.

8

generally the case that a defendant forfeits an argument on appeal where he fails to object at all to the evidence in the trial court or when he objects on substantively distinct grounds."].)

Defendant also fails to cite any authority forbidding identification testimony from witnesses who spoke with other witnesses, viewed a defendant's booking photo, or watched a surveillance video of the crime before testifying as to identification. He likewise fails to supply accurate record citations supporting his claims about questioning the witnesses using Exhibit 89.[4]

Defendant identifies pages 327–328 of the reporter's transcript, but on those pages, Heidi testified about viewing the photo lineup. Defendant also identified page 589 of the transcript. At that page, Detective Harris testified he never showed Nicole "any lineup," and none of the witnesses to whom he showed the photo lineup "could identify anyone 100 percent." Detective Harris also testified he showed the photo lineup to Leila, Doug's girlfriend, and she was unable to identify anyone.

Moreover, the factual claims defendant makes are at best misleading, and at worst contrary to the record. The only reporter's transcript page cited by defendant that mentions Exhibit 89 is page 455. That page shows Nicole was asked about Exhibit 89 as follows: "I am going to show you what is

---

[4] The appellant has the burden of supporting "any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C); *Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 781; see *U.S. v. Dunkel* (7th Cir. 1991) 927 F.2d 955, 956 ["Judges are not like pigs, hunting for truffles buried in briefs."].) Likewise, when an appellant raises an issue but fails to support it with " ' " 'reasoned argument and citations to authority,' " ' " we treat the point as waived. (*Hoffmann v. Young* (2020) 56 Cal.App.5th 1021, 1029, rev. granted Feb. 10, 2021, S266003.)

marked as People's Exhibit 89. [¶] This is a picture of an individual with a tattoo; is that fair to say? [¶] A: Yes. [¶] Q: Is that a tattoo of the same tattoo you saw that evening that was on the individual with the gun? [¶] A: Yes, in this picture you see more of it. But same picture, same placement, same ink. [¶] Q: And the individual *that shot the gun that evening*, do you see that individual in court today? [¶] . . . [¶] A: I do. Q: Can you tell me where he is seated and what that person is wearing?" She identified the defendant. (Italics added.) Contrary to defendant's claim, Nicole was *not* asked "if [she] could identify the man in that photo within the courtroom."

Likewise, Heidi was not asked if she could identify the man in Exhibit 89 in the courtroom. The prosecutor asked Heidi on redirect "the person [on whom] you indicated you saw a tattoo, do you see th[at] person in the courtroom today?" After Heidi responded, "I can't say for a hundred percent, no," the prosecutor asked, "Can you pick any individual whether or not it's a hundred percent or not?"[5] Heidi identified defendant. Neither Heidi nor Nicole was asked if they could identify *the man in the Exhibit 89 photo* in the courtroom.

Although defendant's transcript cite is wrong, Kalin was the only one of the three asked, "That person in that picture, do you see that person in the court today?" after identifying the tattoos of the pictured individual as the same as the shooter's. The court overruled the defense attorney's objection: "Foundation and improper question." However, the prosecutor then asked: "Now the person who pointed the gun at you, do you see that individual in the courtroom today?" Kalin identified defendant in response to both

---

[5] Defendant also asserts Heidi "was directed to pick someone out in the courtroom, 'whether it's a hundred percent or not." As noted, this misstates the record.

questions. Thus, in the context of the questioning and Kalin's testimony, the questioning was not "suggestive and misleading."

***Exclusion of Expert Testimony***

Defendant also maintains the court erred in excluding the proposed testimony of Dr. Behnan Bavarian, an expert in scientific identification based on biometrics. He claims the exclusion denied him his Sixth and Fourteenth Amendment rights to present a full defense. We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion. (*People v. Watson* (2008) 43 Cal.4th 652, 692 (*Watson*).)

At an Evidence Code section 402 hearing, Dr. Bavarian testified he reviewed the videotape taken at the bar which showed the shooting and did a "quantitative analysis" to determine whether there was enough "information to define some sort of a measure, measurements that will allow comparison of the person of interest in the videos and the subject that we had the mug shots and clear pictures of." He opined there was "not enough measurable data" in the video and concluded "there is not enough information in there to allow this evidence to be used for any kind of qualitative or quantitative sort of comparison." Dr. Bavarian concluded "it will actually mislead the jury to use the video so because we know for [a] fact that there is no measurable information in there."

Dr. Bavarian conceded he did not have the expertise to conclude biometric methodology is the same type of methodology used by the human brain to make comparisons. He testified the use of biometrics is "not an eye," "[w]e wish we [c]ould get to the brain level but we are not there yet. . . . [The] brain is more complex and much more processing [is] involved there."

In granting the motion to exclude, the trial court initially stated: "In thinking this through I'm going to grant the People's motion to exclude this

11

witness.  I do not find it to be relevant.  I'll state my reasons so you have those.  Whether or not you can use certain data points to make identification to a known photograph from a scientific standpoint or biometrics standpoint is not relevant to the inquiry.  The jury makes this finding based on proof beyond a reasonable doubt and the human element here, so I think by injecting this sort of testimony, this standard in it interferes with the proof beyond a reasonable doubt standard.  We are not talking about the scientific standard here.  Whether or not there are enough data points, again, to make this sort of comparison I think under [Evidence Code section] 352 is confusing and misleading to the jury.  Again, I think it does start to get into a standard that is not relevant to the jury in terms of beyond a reasonable doubt.  I think it might be a different question if the People were trying to first offer some evidence, scientific evidence that a known photograph matched up with all these points and then a defense expert said no, from these data points you cannot draw that conclusion.  That would be a different analysis here, but we don't have that situation here."

Following the Evidence Code section 402 hearing, the trial court indicated its initial ruling would stand.  It explained, "What I meant to say, if I said something different, was [the proposed testimony] injects a different standard of proof.  The jury's standard is beyond a reasonable doubt.  It is not the quantitative analysis or quantitative standard of proof that was suggested by the doctor. . . .  [A]s to any qualitative opinions, none of those in the Court's view are proper opinions.  The jury does not need an expert to testify that this video should not be used as comparison for a suspect because it is fuzzy or has fuzzy information.  Similarly, [an] expert is not needed to say this video is not good enough to show to a jury for the purposes of ID.  All of those are within common experience.  One can look at the videos, and if

12

they feel they're fuzzy, they feel they're fuzzy. Those are not proper expert opinions. . . . [¶] . . . As to a limiting instruction as to whether the photos are direct or circumstantial evidence . . . I'm not inclined to give a limiting instruction. Direct evidence is something you see. So they see the video. That's direct evidence, what they see. They can make whatever inferences or observations they chose to out of those videos. . . . [U]nder [Evidence Code section] 352 I would keep [the expert testimony] out as well. [¶] . . . [¶] [A]s the potential for confusion of the issues and misleading of the jury would outweigh any potential probative value."

"The correct rule on the necessity of expert testimony has been summarized by Bob Dylan: 'You don't need a weatherman to know which way the wind blows.' The California courts, although in harmony, express the rule somewhat less colorfully and hold expert testimony is not required where a question is 'resolvable by common knowledge.' " (*Jorgensen v. Beach 'N' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163, fn. omitted.)

" '[T]he identity of a person is a proper subject of nonexpert opinion . . .' " (*People v. Leon* (2015) 61 Cal.4th 569, 601, quoting *People v. Perry* (1976) 60 Cal.App.3d 608, 612.) "It is now clearly established that lay opinion testimony concerning the identity of a robber portrayed in a surveillance camera photo of a robbery is admissible where the witness has personal knowledge of the defendant's appearance at or before the time the photo was taken and his testimony aids the trier of fact in determining the crucial identity issue. [Citations.] Where the photo is unclear, or the defendant's appearance has changed between the time the crime occurred and the time of trial, or where for any reason the surveillance photo is not conclusive on the identity issue, the opinion testimony of those persons having knowledge based upon their own perceptions (Evid. Code, § 800, subd.

13

(a)) of defendant's appearance at or before the time the crime occurred is admissible on the issue of identity. . . ." (*People v. Ingle* (1986) 178 Cal.App.3d 505, 513.)  "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Leon,* at p. 601.)

Defendant asserts a "trial court may exclude an expert's opinion testimony *only* if that expert lacks an adequate basis in formulating it," (italics added) citing *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747.  *Sargon* does not so hold.  Indeed, *Sargon* states:  "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.  Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Id.* at pp. 771–772.)

Here, the trial court did not abuse its discretion in concluding expert testimony on consideration of the surveillance video was not necessary and was more prejudicial than probative.

Because the trial court did not abuse its discretion in excluding the testimony, defendant's federal constitutional claim also lacks merit.  " '[T]he United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible.' " (*Watson*, *supra*, 43 Cal.4th at pp. 692–693.)

### *Evidence of Defendant's Alteration of His Appearance*

#### *Testimony About Defendant's Appearance At Trial*

14

Defendant maintains the court erred in allowing Officer Harris to testify about his observations of defendant at trial, which he asserts constituted improper "demeanor" evidence.

Officer Harris testified he observed defendant put on glasses in court before certain witnesses were asked to identify him. He noted that defendant had not worn glasses when he was arrested or questioned. Nor had police found any glasses in the car in which defendant was a passenger when he was arrested, although other indicia related to defendant were found.

Defendant relies on *People v. Garcia* (1984) 160 Cal.App.3d 82 (*Garcia*) to support his claim that Officer Harris's testimony about him putting on and removing glasses at trial was improper demeanor evidence.

In *Garcia*, jurors advised the court that defendant and a spectator in the courtroom were smirking or jeering during the testimony of a witness. (*Garcia*, *supra*, 160 Cal.App.3d at p. 87.) The court instructed the jurors to " 'disregard what anyone in the audience did, that that it in no way constituted legal evidence, and that they must ultimately predicate their decision only on the evidence that was produced here in the Courtroom.' " (*Id*. at p. 90.) The defendant claimed this instruction "impermissibly allowed the jurors to consider defendant's courtroom conduct in their determination of his guilt or innocence," and the record "clearly establish[ed] that the trial court believed th[e] defendant's courtroom demeanor could properly be considered by the jury in their evaluation of his guilt or innocence." (*Ibid*.)

*Garcia* explained "[o]rdinarily, a defendant's nontestimonial conduct in the courtroom does not fall within the definition of 'relevant evidence' as that which 'tends logically, naturally, [or] by reasonable inference to prove or disprove a material issue' at trial." (*Garcia*, *supra*, 160 Cal.App.3d at p. 91.) "[D]emeanor evidence is only relevant as it bears on the credibility of a

15

witness." (*Ibid*.) "Authorizing the consideration of such demeanor in the determination of guilt or innocence also runs the grave danger of inviting the jury to use the character of the accused to prove guilt–something that is wholly improper unless the defendant first present evidence of his good character." (*Ibid*.)

The appellate court went on to explain, however, that "[i]t should not be inferred from this analysis that we somehow disapprove of the routine practice of a jury viewing the defendant's physical appearance to see if it comports with a physical description given by a witness or to determine if the physical appearance of a defendant supports a factual finding that must be made by the trier of fact. . . . Our holding is limited to those instances where defendant's nontestimonial behavior at counsel table is not objectively relevant to any disputed issue at trial and is merely offered to show defendant's character or a trait of his character." (*Garcia, supra,* 160 Cal.App.3d at p. 92, fn. 7.)

Here, the claimed "demeanor" evidence—that defendant put on his glasses before witnesses were asked to identify him in court—was relevant to the disputed issue of identity and as evidence of his consciousness of guilt. "It is not improper for a prosecutor to suggest that a defendant deliberately altered his or her appearance to raise doubt concerning the defendant's identity as the perpetrator, unless the prosecutor knows that the change in appearance was motivated solely by a reason unrelated to the reason suggested by the prosecutor." (*People v. Foster* (2010) 50 Cal.4th 1301, 1355.) "[T]he courts have long held ' " [a]ny conduct of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible. . . ." ' [Citation.] '[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested

16

inference [of consciousness of guilt].' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497–498, italics omitted.)

Defendant further claims the evidence "was not probative" because Officer Harris's testimony was "based on an incomplete and inaccurate observation" of defendant, and the officer was "equivocal about the role that the prosecutor played in encouraging his sporadic observations." These concerns, however, go to the weight of the evidence, not whether it was relevant.

Defendant alternatively urges that even if relevant, Officer Harris's testimony was more prejudicial than probative. He maintains he was "entitled to rely on the State's case and not be subject to testimony [or be] put into the position of either testifying to disavow the stated purpose of relying on his reading glasses or remain silent and let the jury consider the evidence which remained largely unrebutted other than [defendant's wife's] testimony that [defendant] wore reading glasses."

Defendant misconstrues the prejudice analysis. First, a defendant is always "put into the position of either testifying . . . or remain[ing] silent" in response to evidence introduced by the prosecution. That is not prejudice. Secondly, " ' "[p]rejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. . . . " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439.)

In sum, the trial court did not abuse its discretion in admitting Officer Harris's testimony.

### *Defendant's Prior Booking Photos*

Defendant asserts the trial court erred in admitting 15 of his booking photos, taken from 2004 through 2016.[6]  The court admitted the photos in a "sanitized" condition, "so the jury does not know what these are in terms of booking photos."  Defendant claims the photos were unauthenticated, hearsay, not relevant, inadmissible character evidence, and more prejudicial than probative.

The trial court, in admitting the photos, concluded "It is relevant to show all throughout the years he's had the moustache.  The facial hair is similar to what has been testified to and/or seen on the videos, so I think it is relevant.  The jury can make these sorts of comparisons.  And the People's argument [is] he's had consistently facial hair throughout these years, [and] at this point [h]e does not.  You can argue the opposite.  It doesn't mean anything, but it is relevant evidence.  And under [Evidence Code section] 352 I would not exclude it. . . . [T]here is [the] authentication issue.  These are certified documents."  "I'm going to allow the photos. . . .  There is a theory of relevance that's been expressed by the People."

Defendant has forfeited his hearsay and authentication objections.  He did not object on hearsay grounds, and after acknowledging the photographs were certified records, he reframed his lack of authentication claim as a relevance objection[7].

---

[6]  People's Exhibit 82, which was a photo of defendant titled "Mugshot Profile Short," was not admitted at trial.

[7]  Defendant's attorney initially objected:  "[T]here isn't authentication.  Just because it's an official record it doesn't come in."  The court asked:  "Let me make sure I under[stand].  Are you talking about the need to have a custodian of records to come in to say this is, in fact, [defendant] or this is the way we prepare these records?"  Defendant's attorney responded: "No.  No.

18

As to his claim the photographs were inadmissible character evidence under Evidence Code section 1101, he asserts they "had no relevance other than propensity evidence . . . an effort to demonstrate to the jury that [defendant] had been arrested on several occasions.

It is true that the admission of mug shots may make " 'the difference between the trial of a man presumptively innocent of any criminal wrongdoing and the trial of a known convict' (*United States v. Reed* (7th Cir. 1967) 376 F.2d 226, 228) and may well be equivalent to the introduction of direct evidence of prior criminal conduct." (*People v. Vindiola* (1979) 96 Cal.App.3d 370, 384, abrogated on another ground in *People v. Carter* (2003) 30 Cal.4th 1166, 1197.) And in *People v. Cook* (1967) 252 Cal.App.2d 25, on which defendant relies, the photograph in question was problematic because it was "in the familiar and unmistakable format of a police mug shot. It shows appellant's full face and profile, side by side. Each of the paired pictures has a printed legend which was photographed with appellant from a sign placed in front of him. These words and figures appear on the legend: SAN PABLO CALIF POLICE DEPT 10 24 59 8156 H J COOK." (*Id.* at p. 27.)

The photographs to which defendant objects, however, contain no indication they were mugshots. Unlike the photos in *Cook*, the photographs depict defendant's face only from the front, and do not have any writing

___

It's not that, but it has to be relevant. I mean, right, not the custodian of records. I mean, you know, right, not about the official record writing." The court stated: "That's where authentication–when I hear authentication, that's what I generally think about is having the custodian say these are records prepared in the normal course of business." Defendant's attorney responded: "I meant authentication one step further. One, relevance, and that relates always to foundation. . . . For these you would need someone to come in and say, you know, he looked like this back then. . . . So that's the authentication and foundation that's needed to actually make the official record admissible."

19

indicating a police department or booking number. The only writing on the photos is defendant's name and a date. Indeed, the trial court ordered the photographs to be "sanitize[ed] of everything except perhaps the name and the photo date. Everything else will be sanitized so the jury does not know what these are in terms of booking photos." Thus, the trial court did not err in concluding the photos, as admitted, were not inadmissible character evidence.

Defendant lastly claims that even if admissible, the trial court abused its discretion by not excluding the booking photos under Evidence Code section 352.

In seeking to admit the photos, the prosecutor explained they were relevant "to show that the defendant was altering his appearance to make it more difficult to identify him. He was arrested with a shaved face. All those pictures show that since 1994 the defendant has had facial hair and [it] seems to be not a coincidence that the date after the shooting he is now clean-shaven. [¶] . . . [¶] That coupled with the fact he's putting on glasses just as the eyewitnesses are asked to identify him in court is all relevant to show he's trying to alter his appearance to avoid being identified."

As with the evidence that defendant put on glasses before potential witness identifications, evidence that he had facial hair for years before the shooting, but not after, was relevant. And so too, the type of prejudice resulting from that evidence was not the type of prejudice that Evidence Code section 352 was designed to avoid—it was the "damage to a defense that naturally flows from relevant, highly probative evidence.'" (*People v. Doolin, supra,* 45 Cal.4th at p. 439.)

20

### *Evidence Regarding the Holster and Bullet Hole in the Car*

The trial court admitted evidence that the car in which defendant was a passenger when he was arrested had a bullet hole in the floorboard and that a gun holster was found in the side pocket. Defendant claims this evidence was irrelevant, improper character evidence, more prejudicial than probative, and violated his due process rights.

"The elements of unlawful possession may be established by circumstantial evidence and any reasonable inferences drawn from such evidence." (*People v. Williams* (1971) 5 Cal.3d 211, 215, superseded by statute on another ground as stated in *People v. Romero* (1997) 55 Cal.App.4th 147, 152–153.) Accordingly, evidence of gun-related materials in the absence of a gun have been found admissible to show defendant's possession of a gun. In *People v. Neely* (1993) 6 Cal.4th 877, deputy sheriffs found ammunition and a weapon in a pickup truck at the crime scene, shortly after commission of the crimes. The truck was registered to defendant's wife. (*Id*. at p. 885.) Although the gun found in the vehicle was not the murder weapon, the court concluded "admission of the gun and the ammunition was not prohibited. . . . [T]here was no direct evidence as to the fatal shooting that would render this evidence irrelevant to establish facts material to proof of the charged offenses." (*Id*. at p. 896.) Similarly, in *People v. Price* (1991) 1 Cal.4th 324, "defendant's possession of shotgun ammunition at his mother's residence did have some tendency in reason to establish his possession of the shotguns seized from the Reno storage locker." (*Id*. at p. 434.)

As the trial court concluded, evidence of the bullet hole in the floorboard of the car and the holster in the side pocket was relevant circumstantial evidence in connection with the charge that defendant was a felon in possession of a firearm. Defendant was found in the car the day after

the shooting, and the car contained indicia linking defendant to the vehicle. The jury was also instructed on the use of circumstantial evidence. "Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question."

Defendant maintains the evidence had "no relevance except as prohibited propensity evidence." Relying on *People v. Barnwell* (2007) 41 Cal.4th 1038 (*Barnwell*), he asserts that "[e]vidence of possession of a weapon not used in the crime charged against a defendant is inadmissible because it, 'leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons–a fact of no relevant consequence to determination of the guilt or innocence of the defendant.' "

*Barnwell* involved significantly different facts. In that case, the trial court admitted the testimony of a police officer tending "to show that a year before the murders defendant possessed another handgun similar to the murder weapon." (*Barnwell, supra,* 41 Cal.4th at p. 1055.) "The trial court ruled that [the officer's] testimony was relevant to defendant's identity as the murderer because the 'relatively unique' characteristics of the pistol she found in his possession demonstrated his 'propensity to own or carry that type of weapon.' " (*Id.* at p. 1056, italics omitted.) Our Supreme Court held the court erred. "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.] Because the prosecution did not claim the weapon found by [the officer] was the murder weapon, its admission was error." (*Ibid.*)

Here, in contrast, the bullet hole and empty holster were found in the car in which defendant was seated the day following the shooting, the vehicle contained indicia related to defendant, and the evidence was offered not to establish the defendant's identity, but to prove he was a felon in possession of a firearm.

Nor did admission of this relevant evidence render defendant's trial fundamentally unfair such that it violated his due process rights. " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jones* (2013) 57 Cal.4th 899, 949, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 913.) No such prejudice is shown here.

## *Prosecutorial Misconduct*

Defendant makes numerous claims of prosecutorial misconduct during closing argument, many regarding comments on evidence defendant claims should have been excluded. He asserts, for example, that the prosecutor committed misconduct when "he argued to the jury that the reading glasses were taken on and off during trial to hinder recognition of [defendant] by the witnesses." However, we have rejected defendant's claim that this evidence was improperly admitted, and argument as to such evidence was entirely permissible.

### *Misstatements of Fact*

Defendant also claims the prosecutor made misstatements of fact. The prosecutor argued: "[T]hey find the defendant nine hours later. And he's driving in a car. What is notable about that car? It has a holster in it. . . . [¶] . . . [¶] Circumstantial evidence is th[at] defendant has a gun. He's driving the car. There [are] letters addressed to him in the car." Defense

counsel objected, without success, that this "misstates evidence driving the car actually."

Although defendant is correct that the evidence showed he was in the passenger seat when the police finally stopped the car, Officer Harris testified that he earlier saw the "driver and the passenger change their seats inside the car. . . .  [The] driver moved to passenger, passenger moved to the driver position, and they drove off."  Thus, the prosecutor did not misstate, but rather drew a reasonable inference from, the evidence.  Further, the jurors were instructed that they were the exclusive finders of fact.  Thus, it was their province to determine whether defendant was, in fact, the driver, the passenger, or had switched places.  Accordingly, there is no reasonable likelihood the jury construed the remarks in an improper fashion.  (See *People v. Steskal* (2021) 11 Cal.5th 332, 350 (*Steskal*) ["When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion."].)

Defendant next claims the prosecutor misstated:  "[Defendant] got rid of the gun because they weren't able to find a gun.  He forgot about the holster."  (Italics omitted.)  The prosecutor actually argued: "I submit to you the defendant got rid of the gun because they weren't able to find a gun.  He forgot about the holster.  It was still in the car."  Thus, contrary to defendant's claim, it was clear the prosecutor was again drawing a reasonable inference based on the evidence, which he had " ' "wide latitude" ' " to do.  (See *Steskal, supra,* 11 Cal.5th at pp. 362–363.)

Defendant additionally claims the prosecutor made the following false statement about the sanitized booking photos:  "There is nothing disputed about those pictures as far as their authenticity, or that they are of defendant

24

or the dates." (Italics omitted.) The prosecutor actually said: "There is nothing about those pictures which are disputed as far as their authenticity. There is no dispute they are of the defendant. There is no dispute they are taken on those dates of the defendant, and the purpose of those is to show this defendant always had facial hair most of his adult life, and it's not a coincidence I submit to you that he didn't have facial hair nine hours after the incident because he shaved to avoid being recognized." The trial court overruled defense counsel's objection of "[f]acts not in evidence. Vouching."

Defendant maintains "there was a significant dispute" over the photos, pointing out he made an objection to their admission which was overruled. As we have discussed, defendant abandoned his authentication objection and, instead, argued relevancy. And whether the photographs were relevant is a different issue than whether they were actually of defendant or taken on the indicated date.

Next, defendant claims the prosecutor falsely stated: "Now the defendant has since shaved because he's clean-shaven. . . . It was no coincidence why [defendant] was clean-shaven the day of the shooting." (Italics omitted.) In his closing argument, the prosecutor actually stated, in reference to the photos of defendant and the barroom video: "Now, the defendant has since shaved because he's clean shaven. I'll go into that later." A few moments later, the prosecutor stated: "Spanning back from 2006 the defendant, random pictures, has [a] goatee or facial hair of some sort. Yet now nine hours after the bar shooting he's clean shaven. That's not a coincidence. . . . You look at the picture, all those compared to the defendant here, the defendant in the video, same person. Not coincidence why he shaved."

Contrary to defendant's claim, these statements were not false and, again, within the wide latitude given to prosecutors to argue reasonable inferences from the evidence at trial. (See *Steskal, supra,* 11 Cal.5th at pp. 362–363.)

Defendant also claims the prosecutor misstated: "[Doug] was absolutely believable. All the witnesses picked number one in the lineup, because he was the one shooting up the bar." However, the prosecutor's actual words were: "As far as Doug . . . , again, he was shown a photo lineup consistent with all the people who were shown the photo lineup who testified. He chose either number one or number three. Number one is the defendant. He too had personal, up close with the defendant. Able to pick him in court. Absolutely believable. He was accurate. [Heidi] . . . was shown a photo lineup. [She] wasn't as close to the defendant. . . . She recognized the tattoo, identified the tattoo, the defendant and the tattoo. It was the same guy with the tattoo. On top of that, she was shown the six photographs. Again, she picked number one or three. So [Jeffrey] picked number one. [Doug] picked number one. [Heidi] picked number one. Who is number one? [Defendant.] [Another patron] was shown the same lineup. Same result. Picked either number one or number four. Again there is a pattern here. Everyone is picking number one. Why are they all picking number one? Because number one, [defendant], was the person shooting up the bar. It's consistent."

Defendant asserts these statements were false because "photo number one contains the only male wearing a hoodie . . . none of the lineup witnesses were certain that he was the perpetrator, and some articulated reasons why he looked different from the actual gunman. Every lineup witness selected two photos as actual suspects."

However, defendant has mischaracterized the prosecutor's argument. Considering the entirety of the argument, it is apparent the prosecutor was not making false statements but pointing out that while some witnesses picked two pictures from the lineup, all of them chose number one as one of the identified pictures. And contrary to defendant's claim, stating Doug's identification was believable was not improper vouching because the " 'prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses [were] based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief." ' " (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

Lastly, defendant claims the prosecutor falsely stated: "[Nicole] was taking in the perpetrator's features," and "[a]ll the people who identified [defendant] were paying attention to his face." (Italics omitted.)

Again, defendant has mischaracterized the prosecutor's argument. At the cited pages of the transcript, the prosecutor actually argued: "[Nicole], also like [Kalin the bouncer], saw the defendant up close and personal. She described seeing the tattoo as well. . . . [Nicole] had a strong recognition. She's the one who gave the most detail about what type of contact she had. She was able to see that he had dilated eyes. It was a 90 second contact. For 30 seconds she was staring straight in the face when she said that I was looking right in his face. 30 seconds. You're staring [at] someone for 30 seconds looking at them straight in the eyes. You are taking in the features. Someone straight in the eyes, you are recognizing that person. [¶] . . . No hesitation when she pointed at him in court, and what makes her more credible is that she actually was able to exclude the individual who they stopped." "The people who were able to identify defendant in court, again,

27

are the people who had the strong recognition, people who had the gun pointed in their face."

In sum, defendant has not shown that any of the challenged statements made by the prosecutor were inaccurate.

### Comments Concerning Defense Counsel

Defendant next maintains certain comments by the prosecutor denigrated defense counsel by "suggest[ing] to the jury that defense counsel somehow violated ethical rules of practice and . . . was not seeking the truth but instead was attempting to mislead gullible jurors into acquitting her client by either trying to hide evidence, . . . distract[ing] them with irrelevant information, or create[ing] a sideshow with [defendant's] on and off removal of reading glasses during trial." Defendant asserts the comments denied him his constitutional right to effective assistance of counsel.

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.] [¶] Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. (See *People v. Frye* (1998) 18 Cal.4th 894, 977–978 [, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22] . . . [no misconduct where prosecutor accused counsel of making an ' "irresponsible" ' third party culpability claim]; *People v. Medina* (1995) 11 Cal.4th 694, 759 . . . [no misconduct where prosecutor said counsel can ' "twist [and] poke [and] try to draw some speculation, try to get you to buy something" '].) In so doing, the prosecutor may highlight the discrepancies between counsel's opening

statement and the evidence. [Citation.] Misconduct claims also have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced [citation], and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

Defendant identifies three comments by the prosecutor during his final closing that defendant maintains denigrated defense counsel. The first is the prosecutor's assertion that: "[T]hose pictures allow you to get a better look at defendant. It's curious how defense counsel doesn't want you to get a better look at defendant. That's what those pictures do." The next is the prosecutor's assertion that: "Same with the glasses. . . . It's curious the timing of when he put on those glasses. . . . It's a sideshow. Her client got caught." The third is the prosecutor's assertion that defense counsel's argument about the lack of forensic evidence is "a red herring argument."

None of these assertions denigrated defense counsel. To the contrary, the prosecutor's argument that defense counsel "doesn't want you to get a better look at defendant" was in response to counsel's plea to the jury to "please don't consider" the photographic evidence showing defendant had had facial hair for years before his arrest. As for the prosecutor's "side show" comment, it was in response to defense counsel's own claim of a side show. She had argued: "[Wasting] court time trying to discuss whether or not a man shaved or not, when he took off his glasses, I ask you please don't consider that as evidence. That is a side show. . . ." Counsel likewise argued the prosecutor's questioning of defendant's alibi (that he was spending a romantic evening with his wife in a motel) was a "side show of what a husband and a wife are doing at a motel room."

29

In sum, the prosecutor's comments were well within the latitude allowed prosecutors in describing deficiencies in the evidence and responding to defense arguments. There was no misconduct and, likewise, no impairment of defendant's right to effective assistance of counsel.

### The "Abiding Conviction" Comment

Defendant also asserts the prosecutor wrongly "suggested that the witnesses' certainty was an abiding conviction within the meaning of the reasonable doubt instruction." (Capitalization & underscoring omitted.) This, he claims, was misconduct and an infringement of his due process rights because an "abiding conviction . . . does not pertain to the witnesses, but rather the jurors themselves."

" ' "[I]t is improper for the prosecutor to misstate the law generally . . . and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. . . ." [Citation.] . . . However, '[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 111.)

Defendant concedes, however, that his counsel failed to object to the challenged comment. He nevertheless asserts the issue was not forfeited because his counsel had "already unsuccessfully objected to several other facets of the prosecutor's argument," as well as made at least 19 unsuccessful evidentiary objections. Defendant maintains the "entire climate of this trial more than supports a conclusion that further objections would have been futile." Thus, he "requests that this court exercise its discretion in the instant case to review the instances of misconduct." We do not agree with

30

defendant's characterization of the trial and decline to consider his belated challenge to the prosecutor's argument.

Defendant alternatively maintains his counsel's failure to object constituted ineffective assistance of counsel. "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

Defendant asserts there was " 'no conceivable tactical purpose' " for his counsel's failure to object. But he has provided one himself, in his assertion of no forfeiture: "Repeated unsuccessful defense objections harm the defense before the jury. . . . 'Trial lawyers are well aware that frequent[] admonitions to a jury to disregard that which has already been implanted in their minds serve only to emphasize and underline and sometimes transform the inconsequential into indelibility.' " In short, it is entirely conceivable that counsel made objections only to those prosecutorial comments she deemed most egregious, and this passing comment was not of such magnitude.

***Appeal to Juror Sympathy***

Defendant also claims the prosecutor committed misconduct because he "asked the jury to grant [Jeffrey] and [Doug] justice, telling them that they had waited 187 days for justice."

" 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present

31

"irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.) " ' "[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342, quoting *People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial. [Citations.] We recognize that the prosecutor 'may vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citations], but the bounds of vigorous argument do not permit appeals to sympathy or passion. . . ." (*People v. Fields* (1983) 35 Cal.3d 329, 362–363, fn. omitted (*Fields*).)

Relying on *Fields and People v. Vance* (2010) 188 Cal.App.4th 1182 (*Vance*), defendant claims the prosecutor's statements were improper appeals to sympathy for the victims.

In *Vance*, the Court of Appeal concluded the prosecutor improperly made the " 'Golden Rule' " argument. "In its criminal variation, a prosecutor invites the jury to put itself in the victim's position and imagine what the victim experienced. This is misconduct, because it is a blatant appeal to the jury's natural sympathy for the victim." (*Vance, supra,* 188 Cal.App.4th at p. 1188.) The prosecutor, however, did exactly that, arguing: " 'In order for you as jurors to do your job, you have to walk in [the victim's] shoes. You have to literally relive in your mind's eye and in your feelings what [the victim] experienced the night he was murdered. . . . Can you imagine . . . [g]etting out of your car with the two people you thought up to that point were your friends . . . [a]nd then suddenly, without warning, being jumped, being put into a choke hold, taken down to the ground and choked out.

You're trying to gasp for air but the pressure from the choke hold doesn't let up. . . . [¶] We all on one occasion or another have experienced the sense of what it's like to be suffocated to a lesser degree, . . . [m]aybe you were held underwater too long while swimming or playing in water as a child. . . . There's nothing more terrifying than a feeling of not being able to breathe. You're totally trapped. Trapped in darkness without the ability to breathe. . . .' " (*Id.*, at p. 1194.)

Similarly in *Fields*, the prosecutor argued: " 'Now, think of yourself as [the victim]. A young librarian from the University of Southern California; a quiet girl, not outgoing. . . . [¶] . . . [¶] . . . The defendant threatens to kill you unless you give him the money. You are now naked and tied to the bed rails of the defendant's bed. You are forced to write several checks. . . . [¶] . . . [¶] . . . [A]ll of a sudden the defendant shoots you on the side and you yell, "Oh, God." [¶] . . . [¶] Do you wonder about heaven, about God? You know there is no escape. The defendant shoots you more times. He states that you are not dead, and he has to make sure you are dead. . . . And it takes 10 or 15 minutes for you to die. Blood meanwhile spatters on your face.' " (*Fields*, *supra*, 35 Cal.3d at pp. 361–362.)

In contrast, the prosecutor here argued: "But the important part of that instruction is you have to choose the reasonable interpretation. You have to reject the unreasonable. . . . [W[hen you look at how the witnesses testified, you look at the conduct of the defendant and you look at everything that I've shown to you there's only one reasonable conclusion. It's the defendant. So [a] hundred eighty[-]seven days is a long time for justice. I'm asking you to grant [Jeffrey] and [Doug] their justice. Find this defendant guilty." This argument does not begin to compare with the improper " 'Golden Rule' " arguments made in *Vance* and *Fields*.

33

Indeed, the courts have rejected similar misconduct claims. A prosecutor's argument that "the only just verdict was to convict defendant of special circumstances murder, because it is 'the only right thing to do in this case' and because '[h]e did it' " was "fair commentary on the evidence presented." (*People v. Seaton* (2001) 26 Cal.4th 598, 663.) Similarly, a prosecutor's request that the jury " 'do the right thing, to do justice, not for our society, necessarily or exclusively, but for [the victim], an 18-year-old boy who was just working at a gas station one night,' " was not improper. (*People v. Medina* (1995) 11 Cal.4th 694, 759.) There was "no reasonable probability that the prosecutor's brief and isolated comments could have influenced the jury's guilt determination." (*Id.* at p. 760.) The same is true here.

### CALCRIM No. 315

The jury was instructed with CALCRIM No. 315, which lists various factors for the jury to consider in determining the accuracy of an eyewitness identification. Defendant claims one of these factors—"[h]ow certain . . . the witness [was] when he or she made the identification"—violated his due process rights.[8]

Our high court recently rejected a like claim. In *People v. Lemcke* (2021) 11 Cal.5th 644, 646 (*Lemcke*), the trial court "provided the jury an instruction modeled on CALCRIM No. 315 that listed 15 factors it should consider when evaluating eyewitness identification evidence. One of those factors stated: 'How certain was the witness when he or she made an identification?' " The defendant maintained the certainty instruction violated

---

[8] Defendant did not object to this instruction, which generally would forfeit any challenge on appeal. The "rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.)

his federal and state due process rights to a fair trial "because empirical research has shown that a witness's confidence in an identification is generally not a reliable indicator of accuracy." (*Ibid*.)

The court held otherwise, stating that "in determining whether a jury instruction violated a defendant's right to due process, the ' "instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." ' " (*Lemcke, supra*, 11 Cal.5th at p. 647, quoting *People v. Foster* (2010) 50 Cal.4th 1301, 1335.) "[T]he instruction does not direct the jury that 'certainty equals accuracy.' [Citations.] Although the language may prompt jurors to conclude that a confident identification is more likely to be accurate, [defendant] was permitted to call an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated. Moreover, the court provided additional instructions directing the jury that it was required to consider the testimony of the expert witness, that the prosecution retained the burden to prove [defendant's] identity as the perpetrator beyond a reasonable doubt, and that witnesses sometimes make honest mistakes."[9] (*Lemcke,* at p. 647.)

As did the defendant in *Lemcke,* defendant here called an "eyewitness memory and suggestibility" expert who testified about the relationship

_____

[9] The court directed, however: "Given the significance that witness certainty plays in the factfinding process, we refer the matter to the Judicial Council and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy. (See Cal. Rules of Court, rule 2.1050(d).) Acting pursuant to our supervisory powers, we further direct that until the Judicial Council has completed its evaluation, trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Lemcke, supra*, 11 Cal.5th at pp. 647–648.)

between a witness's confidence and the accuracy of his or her identification. He opined "confidence can be related to accuracy but only at the time the ID is made. . . . Once you get outside of that moment, that decision in that lineup right there, that's the only data you have. Once you get outside of that there are many factors that can [a]ffect witness competence that can make people more or less confident that can drive my confidence up or down. Confidence decisions made after that tend to be not related to accuracy whatsoever."

And, as in *Lemcke*, the jury was instructed about the presumption of innocence, the prosecutor's burden of proof, that "[p]eople sometimes honestly forget things or make mistakes about what they remember," and on the evaluation of expert testimony.

In sum, to quote from *Lemcke,* "when considered ' "in the context of the instructions as a whole and the trial record," ' [citation], we conclude that listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Lemcke, supra,* 11 Cal.5th at p. 661.)

### *CALCRIM No. 371*

The jury was instructed with CALCRIM No. 371 as follows: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance; however, evidence of such an attempt cannot prove guilt by itself."

Defendant claims this instruction was given in error and violated his due process rights because "the evidence consisted of highly speculative theories based on inadmissible demeanor evidence that consisted of fifteen

mug shots to establish that [defendant] wore facial hair in the past [and] . . . removed his reading glasses sporadically during trial."

We have rejected defendant's claim that this evidence was inadmissible. And the prosecution need only present "sufficient evidence to raise an inference that defendant" tried to suppress evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 921–922.)

To the extent defendant claims "that facts giving rise to an inference of consciousness of guilt must be conclusively established before [the instructions] may be given, [he] is incorrect; there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

Accordingly, the trial court did not err in giving the consciousness of guilt instruction.

### CALCRIM No. 372

The jury was also instructed with CALCRIM No. 372 as follows: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

Defendant claims this instruction "assumed that [he] was in fact the person at the crime scene," and maintains the trial court erred because it "did not direct the jury to address the first step in the analysis, that [defendant] was in fact the perpetrator at the scene."

When requesting this instruction, the prosecutor noted: "assuming we prove identity, we still have to show he met the elements of specific intent. So this goes towards meeting the element of whether he actually committed the crime once we prove the identity." Defense counsel responded: "So we would then definitely need a clause about that identity must be proved beyond a reasonable doubt in this instruction." The court disagreed, stating, "Isn't that just what the lawyers argue in argument? [¶] . . . [¶] The D.A. says his flight is relevant. It's only relevant if they prove it's him. They haven't done that they can say. That's what it seems to me."

CALCRIM No. 372 did not assume the defendant was the perpetrator, rather, it stated "If the *defendant* fled or tried to flee . . . that conduct may show that he was aware of his guilt." It went on to say, "that the defendant fled or tried to flee cannot prove guilt by itself."

In *People v. Mason* (1991) 52 Cal.3d 909, our Supreme Court rejected the claim that a flight instruction is improper when identity is at issue. "If there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight. [Citation.] 'The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. [Citation.] The jury's need to know these things does not change just because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.' " (*Id*. at p. 943.)

Defendant also claims the instruction was improper because he did not act "with the purpose of avoiding observation or arrest," noting he "did not

38

leave the area and apparently made no attempt to flee from police when pulled over." The evidence, however, showed that defendant fled the scene immediately after the shooting, not at the time of his arrest.

In sum, the trial court did not err in giving the flight instruction.

### CALCRIM No. 604

The jury was instructed with CALCRIM 604, the first sentence of which states: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in imperfect self-defense." Defendant maintains this first sentence "created an impermissible burden shifting presumption." (Capitalization omitted.) According to defendant, "[b]y instructing the jurors that they should effectively find [defendant's] conduct to be attempted murder unless they were persuaded to 'reduce' it to attempted voluntary manslaughter, the trial court impermissibly slanted the determination of this pivotal issue toward the prosecution."

Defendant cites no case so holding with respect to CALCRIM No. 604. Instead, he relies on *People v. Owens* (1994) 27 Cal.App.4th 1155 (*Owens*), which addresses CALJIC No. 10.42.6.

In *Owens,* the instruction stated in part: " 'The People have introduced evidence tending to prove' " certain criminal conduct. (*Owens*, *supra*, 27 Cal.App.4th at p. 1158.) The Court of Appeal concluded that "[i]nstructing the jury that the People have introduced evidence 'tending to prove' appellant's guilt carries the inference that the People have, in fact, established guilt. This inference would be eliminated if the phrase 'for the purpose of showing' was substituted for 'tending to prove,' so that the instruction would read: 'The People have introduced evidence for the purpose of showing . . . .' " (*Id*. at pp. 1158–1159, capitalization omitted.)

39

CALCRIM No. 604 does not contain the "tending to prove" language, nor does it contain any comparable language. Indeed, the last paragraph of the instruction makes clear: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of attempted murder."

In any case, "an erroneous instruction requires reversal only when it appears that the error was likely to have misled the jury . . . and whether an erroneous or inartfully phrased instruction misled the jury to the defendant's prejudice is determined by reviewing the instructions as a whole." (*Owens*, *supra*, 27 Cal.App.4th at p. 1159.)

In this case, as in *Owens*, the court instructed the jury as to the presumption of innocence, the beyond a reasonable doubt burden of proof, and that no instruction should be construed as an expression of the court's opinion on any of the facts. (See *Owens*, *supra*, 27 Cal.App.4th at p. 1159.) Thus, even if the language of the instruction were problematic, "[i]n light of the entire body of instructions, it is not reasonably likely that [the instruction] misled the jury on the reasonable doubt standard." (*Ibid*.)

### *Substantial Evidence of Premeditation and Deliberation*

Defendant claims there was no substantial evidence establishing premeditation and deliberation as to the counts of attempted murder.

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the

40

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213, italics omitted.) "The standard of review is the same . . . where the People rely primarily on circumstantial evidence." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

Defendant, relying on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), maintains the record fails to demonstrate the three specific categories of evidence he claims *Anderson* requires. In *Anderson* the court held: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.,* at pp. 26–27, italics omitted.)

41

"In our Supreme Court's most recent iteration on the topic, the court had occasion to point out that the three categories provide 'one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation.' [Citation.] [¶] The high court has further cautioned that the *Anderson* categories are only a set of 'guidelines' for analysis. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32 [, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22] . . . ['We have recently explained that the *Anderson* factors do not establish normative rules, but instead provide guidelines for our analysis.'].) [¶] In particular, the court has emphasized that the three categories themselves do not constitute a substitute for, or a rewriting of, the actual elements of first degree murder. (*People v. Thomas* (1992) 2 Cal.4th 489, 517 . . . ['Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.'].)" (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1112–1113, italics & fns. omitted.)

" '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be

arrived at quickly. . . .' [Citation.] Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things." (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).) " 'First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly. . . .' " (*People v. Nazeri, supra,* 187 Cal.App.4th at p. 1113.)

Defendant claims "there was a complete lack of evidence to show planning indicative of a preconceived plan." Evidence that the defendant arrived at the scene carrying a weapon, however, suggests planning. (*Potts, supra,* 6 Cal.5th at p. 1027; *People v. Elliot* (2005) 37 Cal.4th 453, 471 ["That defendant armed himself prior to the attack 'supports the inference that he planned a violent encounter.' "].) Here, the defendant arrived at the bar right before closing carrying a loaded firearm. When refused a drink, he pulled out the gun and pointed it at numerous people. Rather than leaving the bar, he then pushed his way into a group of patrons, grabbed one by the neck, and shot him in the head. He then proceeded to shoot another patron who tried to intervene, and then fled the scene. His actions, thus, indicate some level of planning, however rapid.

Defendant next urges there was no evidence of motive, the second *Anderson* category, because "there is no evidence of a prior relationship" between defendant and the victims. A "prior relationship," however, is not a requirement to prove motive, and in any event, need not be longstanding. Indeed, "motive to kill [can be] derived from his prior relationship *or conduct with the victim.*" (*People v. Hovey* (1988) 44 Cal.3d 543, 556, italics added.) Here, motive was evidenced by defendant's conduct with the victims. He was angry at being refused service, and he shot the victims after they made attempts to stop him from aiming his gun at other patrons. Revenge because

43

he did not get the drink he demanded, and anger at the bar patrons for interfering with brandishing his weapon, is evidence of motive. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 (*Miranda*) ["As to motive, the evidence showed that immediately prior to the killing, [the victims] refused to sell beer to defendant. . . . The conversation between defendant and his victims suggests that defendant acted with conscious motive and had time to reflect upon his plan to shoot the victims."], abrogated on another ground by *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4; *People v. Watkins* (2012) 55 Cal.4th 999, 1026 (*Watkins*) ["[S]imple revenge because [the victim] did not relinquish the money" was evidence of motive].) There is, moreover, no requirement that the motive be rational. " '[The] law does not require that a first degree murderer have a "rational" motive for killing. Anger at the way the victim talked to him . . . may be sufficient.' " (*Miranda*, at p. 87.)

Defendant lastly claims there was no evidence of the third *Anderson* category—"facts about the manner of killing from which the jury could infer . . . that the defendant intentionally killed the victim according to a 'preconceived design.' " (*Anderson, supra*, 70 Cal.2d at p. 27.) Defendant maintains "the use of [a] firearm to shoot [the victims] does not demonstrate any preconceived plan to kill them." To the contrary, defendant arrived at the bar at 1:30 in the morning with a loaded firearm and pointed the gun at employees when refused a drink. He then pointed the gun at a group of patrons, which included the victims, then grabbed Jeffrey by the throat and pointed the gun at his face. When Jeffrey punched him, defendant shot Jeffrey in the head. After defendant shot Jeffrey, another man in the group of patrons, Doug, attempted to grab the gun. Defendant then shot Doug in the wrist. While this sequence of events happened with relative speed, the evidence does not show, as defendant claims, that the shooting was simply

44

"impulsive" or an "unintended shooting that arose when physically assaulted by two men after running into one of them." Defendant certainly had time to reflect between the bartender's denial of a drink and when he shot the patrons.

In *Watkins*, the high court concluded similar evidence was sufficient to show the *Anderson* factors. "We find sufficient evidence of planning (carrying the loaded, concealed pistol to the position behind the hood of the truck), motive (to effectuate a robbery or its attempt by killing the victim-witness, or simple revenge because [the victim] did not relinquish money) and a manner of killing indicative of intent to kill (a shot fired from a pistol with a heavy trigger pull, which hit the victim's elbow and abdomen as the victim walked quickly away). Viewed as a whole, the evidence supports a finding of premeditated and deliberate murder." (*Watkins, supra,* 55 Cal.4th at p. 1026.) So, too, here.

### *Substantial Evidence of Attempted Murder*

Defendant also asserts no substantial evidence supports his convictions of attempted murder. He first claims "no rational juror could have found proof beyond a reasonable doubt that the gunman did not act in self-defense or imperfect self-defense."

"Self-defense, when based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. [Citations.] A killing committed when that belief is unreasonable is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' " (*People v. Elmore* (2014) 59 Cal.4th 121, 133–134, italics omitted.)

45

Defendant asserts, based on the videotape of the shooting, that it "does not appear that the gunman was committed to a fistfight and appears to be trying to leave from the outset of the confrontation with [Jeffrey]." Thus, he claims "the State's evidence did not refute the self-defense claim presented by its own evidence, the surveillance video."

"[A] victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance." (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 947.)

Defendant's assertion that the videotape establishes self-defense is belied by the other evidence introduced by the prosecution. As detailed in the previous sections, defendant arrived at the bar with a loaded gun. When he was refused a drink, he pointed the firearm at the bartender and bouncer. Rather than leaving the bar, he headed towards a group of patrons, and pushed his way through, pointing the gun at them. Defendant was the initial aggressor, grabbing Jeffrey's neck, and shot him after Jeffrey began hitting him. Defendant next shot Doug as he attempted to grab defendant's gun. Defendant then pointed his gun towards another group of patrons, then "turned and took off" out the back door of the bar. Simply not appearing to be "committed to a fistfight" is not sufficient to show self-defense, and the other evidence presented refuted any inference defendant attempts to draw from the video.

Defendant also claims no substantial evidence supports his conviction of attempt to murder Doug, because the "prosecution did not establish intent to kill." (Capitalization & underscoring omitted.) Given the evidence in this case, including that defendant had just shot Doug's friend Jeffrey in the head

46

and shot Doug when he attempted to grab the gun, there was substantial evidence from which a reasonable jury could find intent to kill.

Defendant has failed to establish that no reasonable jury could find he was not acting in self-defense or imperfect self-defense and that he had the intent to kill. Substantial evidence supports the verdict.[10]

### *Finding That Defendant's Prior Conviction Was a Felony*

Defendant also claims there was no substantial evidence supporting the trial court's finding that his prior conviction of section 136.1, subdivision (b)(2), a "wobbler," was a felony.[11]  He maintains "there are no records submitted regarding [his] plea to the charges, with any indication that his plea to the wobbler section 136.1, subdivision (b)(2) conviction was in fact a felony."

"A wobbler offense charged as a felony is regarded as a felony for all purposes until imposition of sentence or judgment.  [Citations.]  If state prison is imposed, the offense remains a felony; if a misdemeanor sentence is imposed, the offense is thereafter deemed a misdemeanor."  (*People v. McElroy* (2005) 126 Cal.App.4th 874, 880.)

---

[10]  Defendant also maintains the cumulative effect of the claimed errors denied him due process.  Because we have rejected those claims, we necessarily reject the claim of cumulative error.

[11]  Section 136.1, subdivision (b)(2), a "wobbler," provides: "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶]  . . . [¶]  (2) Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof."  (See *People v. Neely* (2004) 124 Cal.App.4th 1258, 1261.)

The felony complaint filed regarding the prior conviction expressly charged it as a felony. The clerk's minutes in that prior case indicate the offense was a felony. Contrary to defendant's assertion, the advisement and waiver of rights signed by defendant indicates it was a felony. The abstract of judgment indicated defendant's sentence for violation of section 136.1, subdivision (b)(2) was two years, to be served concurrently. When defendant's probation was revoked, he was sentenced to a two-year concurrent term for his conviction of section 136.1, subdivision (b)(2).

Defendant urges that, under *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*), the trial court impermissibly engaged in "judicial fact-finding" in concluding defendant's prior conviction of section 136.1, subdivision (b)(2) was a felony. In *Gallardo*, a criminal information alleged that defendant had a prior conviction for "assault with a deadly weapon or with force likely to produce great bodily injury (Pen. Code, former . . . § 245, subd. (a)(1)). It further alleged that this conviction qualified as a 'serious felony' conviction for purposes of Penal Code section 667, subdivision (a)(1). Under that provision, a criminal defendant who commits a felony offense after a prior conviction for a 'serious felony' is subject to a five-year sentence enhancement," and that "serious felony" conviction is also a prior strike. (*Gallardo, supra,* 4 Cal.5th at p. 125, fn. omitted.) The court explained, "[t]he term 'serious felony' is defined to include 'assault with a deadly weapon.' [Citation.] If defendant committed assault with a deadly weapon, the prior conviction counted as a strike; if she committed assault by any means of force likely to produce great bodily injury, it did not." (*Ibid*.)

The *Gallardo* court concluded "a court considering whether to impose an increased sentence based on a prior qualifying conviction may not determine the 'nature or basis' of the prior conviction based on its

48

independent conclusions about what facts or conduct 'realistically' supported the conviction.  [Citation.]  That inquiry invades the jury's province by permitting the court to make disputed findings about 'what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct.' " (*Gallardo, supra,* 4 Cal.5th at p. 136.)  "The trial court's role is limited to determining the facts that were necessarily found in the course of entering the conviction.  To do more is to engage in 'judicial factfinding that goes far beyond the recognition of a prior conviction.' " (*Id.* at p. 134.)

*Gallardo* does not aid defendant, who conflates a trial court's determination of whether a defendant had a prior felony conviction with whether the prior conviction was for a "serious felony" within the meaning of section 667, subdivision (a)(1).  Contrary to his claim, the prosecution was not required to prove "the exact nature of the section 136.1 crime that [he] pled to."  The prosecution only had to prove the prior conviction was  a felony, not whether the facts underlying the conviction demonstrated the conviction was of a "serious felony."  Simply "determining the facts that were necessarily found in the course of entering the conviction" does not violate the *Gallardo* mandate.  (*Gallardo, supra,* 4 Cal.5th at p. 134.)

### *Enhancements for Prison Priors*

Defendant maintains, and the Attorney General concedes, that the two one-year enhancements imposed for defendant's prior prison terms must be stricken.

At the time of defendant's sentencing, section 667.5, subdivision (b) provided for a sentence enhancement of one year for each prior prison term for an offense that was not a violent felony under subdivision (c).  Effective January 1, 2020, the amended version of section 667.5 provides the one-year

enhancement applies only to prior prison terms for a sexually violent offense as defined in Welfare and Institutions Code, section 6600, subdivision (b).

"We agree with the parties that because defendant's sentence is not yet final, and because his prior offense[s were] not . . . sexually violent offense[s], he is entitled to the ameliorative benefit of the amendment." (*People v. Wilson* (2021) 67 Cal.App.5th 819, 832.)

The Attorney General maintains the case should be remanded for resentencing "because the trial court did not impose the maximum sentence here" and the trial court should be allowed to " 'exercise its sentencing discretion in light of the changed circumstances.' "  "[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  This rule does not apply when "the trial court has already imposed the maximum possible sentence, [making] a remand for resentencing . . . unnecessary." (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772–773.)

The trial court did not impose the maximum sentence, but exercised its discretion to impose the midterm on counts three, four and seven. Accordingly, remand for a full resentencing is appropriate. (See *People v. Choi* (2021) 59 Cal.App.5th 753, 770.)

## DISPOSITION

The matter is remanded with directions to strike the one-year enhancements imposed under Penal Code section 667.5, subdivision (b) and conduct a full resentencing.  Following resentencing, the clerk of the trial court is directed to amend the abstract of judgment accordingly and forward a

copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____

Banke, J.

We concur:


_____

Humes, P.J.


_____

Margulies, J.


A154417, *People v. Lopez*